UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| NATIONAL FIRE ADJUSTMENT COMPANY, INC., | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | No. 1:18-cv-00008-LEW |
| ERIC A. CIOPPA, SUPERINTENDENT OF THE MAINE BUREAU OF INSURANCE, | ) ) ) ) ) | |
| Defendant | ) | |

## DECISION AND ORDER

The Plaintiff, National Fire Adjustment Company, Inc., seeks a declaratory judgment stating that the Defendant, Eric Cioppa, cannot enforce 24-A M.R.S. § 1476, which requires that public adjusters adhere to a 36-hour waiting period before soliciting business from Maine citizens or offering a contract for public adjustment services. According to Plaintiff, the statute violates Plaintiff's first amendment speech rights. The parties request a judgment on a stipulated record.

### BACKGROUND

National Fire Adjustment Company, Inc. ("Plaintiff" or "NFA") provides licensed public insurance adjustment services for clients who have suffered property damage in the State of Maine. *Stip. Facts* ¶ 14. NFA holds an active resident adjuster license from the State of Maine's Department of Professional and Financial Regulation, Bureau of

Insurance. *Id.* ¶ 15.

It is the nature of NFA's business to enter into contracts with property owners after the property owners suffer a loss insured by an insurance company. When a property owner retains NFA's services, NFA's employees provide loss-adjustments services to the property owner, which services, ideally, will provide the property owner with a method for adjusting (placing a value on) the insured loss that is more favorable to the property owner than the method used by adjusters employed or contracted by the property owner's insurance company. By providing this service, NFA's adjusters (sometimes called "public adjusters") help ensure that property owners settle coverage claims with their insurance companies for fair value. *Id.* ¶ 6. In return for their services, public adjusters charge a fee to the policyholder. The fee is usually a percentage of the overall damage recovery paid by the insurance company. *Id.*

Since 1997, through the Maine Insurance Code, the State of Maine has restricted the ability of public adjusters to solicit business within a 36-hour window following a loss. In its current form,[1] the so-called "36-Hour Rule" reads as follows:

> **1. Solicitation.** An adjuster seeking to provide adjusting services to an insured for a fee to be paid by the insured may not solicit or offer an adjustment services contract to any person for at least 36 hours after an accident or occurrence as a result of which the person might have a potential claim.

---

[1] The Legislature amended the 36-Hour Rule both before and after its initial passage. In its initially proposed form, the Rule stated that public adjusters "may not solicit or otherwise offer adjustment services." Stip. Facts ¶ 35, citing L.D. 335, § 1 (118th Legis. 1997). As first enacted, the Rule stated that public adjusters "may not solicit or offer an adjustment services contract." *Id.* ¶ 37, citing Comm. Amend. A to L.D. 335 (118th Legis. 1997).

24-A M.R.S. § 1476(1).[2]

When it reviewed the merits of the proposed legislation, and in the course of deliberations that resulted in amendments to the 36-Hour Rule, the Legislature did not consider or rely on any factual findings of fraudulent, misleading, intrusive, or otherwise concerning communications by public adjusters. *Stip. R.* ¶ 43.

Defendant Eric Cioppa is the Superintendent of the Maine Bureau of Insurance. *Id.* ¶ 24. The Maine Bureau of Insurance is one of five agencies within the State of Maine's Department of Professional and Financial Regulation. *Id.* ¶ 25. The Maine Bureau of Insurance regulates the State's insurance industry, including by licensing insurance adjusters and imposing discipline for violations of the State's insurance laws. *Id.* ¶ 26. In addition to other duties, Superintendent Cioppa is charged with protecting consumers from misleading or fraudulent business activities. *Id.* ¶ 27.

Adjusters in Maine must be licensed and are governed by a comprehensive state regulatory scheme to protect the public from misleading or fraudulent business activities. *Id.* ¶¶ 28-29. Among other tools in his enforcement arsenal, Superintendent Cioppa is authorized to revoke, suspend, place on probation, or otherwise limit the licensure of adjusters, and to impose civil penalties and restitution orders, for violations of any law

---

[2] In addition to imposing the 36-Hour Rule, the statute also provides that a contract for public adjuster services may be rescinded by the property owners within two business days of its execution:

> 2. Contract provision. Any such adjustment services contract must contain a provision, prominently printed on the first page of the contract, stating that the person contracting with the adjuster has the option to rescind the contract within 2 business days after the contract is signed.

*Id.* § 1476(2). Plaintiff does not challenge the contract rescission provision.

enforced or rule adopted by the Superintendent. *Id.* ¶¶ 29-33.

Superintendent Cioppa has imposed discipline on public adjusters, including suspensions from practice and civil penalties, for violations of the 36-Hour Rule. *Id.* ¶ 46. For example, in October 2012, Superintendent Cioppa suspended a public adjuster's license for 30 days and ordered him to pay a $500 civil penalty because he had violated the 36-Hour Rule. The adjuster left two telephone messages concerning his services for property owners who experienced a fire-related loss. *Id.* ¶ 47.

NFA has two employees who work as adjusters in Maine, both of whom are duly-licensed. *Id.* ¶ 17. Superintendent Cioppa is not aware of any evidence that NRA's Maine-based adjusters have engaged in any false or misleading statements in their communications with clients regarding NFA's public insurance adjustment services. *Id.* ¶ 23. NFA has instructed its adjusters in Maine to adhere to the 36-Hour Rule. *Id.* ¶ 48. NFA's public adjusters in Maine are presently adhering to the 36-Hour Rule to avoid discipline by the Superintendent. *Id.* ¶ 49. NFA's public adjusters in Maine have created time-keeping and alert systems to ensure that they wait the full 36 hours after a fire before contacting a property owner. *Id.* ¶ 50.

In addition to the foregoing stipulated facts, the parties have stipulated to the following facts concerning the impact of the 36-Hour Rule on public insurance adjustment services. Accordingly, the Court accepts it as established that the first 36 hours after a fire are a critical time for public adjusters to communicate with potential clients about their services; that the first 36 hours after a fire can be stressful, hectic, and traumatic for property owners who have suffered damage; that property owners may relocate to

temporary housing immediately after a fire loss, so that there may be a very short period of time for a public adjuster to locate and communicate with the policyholder; that property owners may agree to cleaning or tear-down services immediately after suffering a property loss, impeding the ability of public adjuster to assess the value of the loss; and that, by logical extension, NFA public adjusters' adherence to the 36-Hour Rule is causing NFA's public adjusters to lose business on an ongoing basis. *Id.* ¶¶ 7-12, 51.

Performing public insurance adjusting services for policyholders in accordance with Maine law is a lawful business activity and is not inherently misleading. *Id.* ¶ 13.

## DISCUSSION

Plaintiff argues the 36-Hour Rule violates the First Amendment because it is a "content- and speaker-based restriction on speech [that] is presumptively unconstitutional viewpoint discrimination." Pl.'s Mot. for Disposition of Liability Issues by Judgment on a Stip. R. at 2, ECF No. 21 ("Pl.'s Mot."); *see also* Complaint ¶¶ 4-5. In the alternative, Plaintiff argues the Rule imposes burdens that either do not advance the State's interest or sweep more broadly than necessary to achieve the stated interest. Pl.'s Mot. at 2; Complaint ¶ 44. Defendant argues the 36-Hour Rule directly advances a substantial governmental interest and is no more burdensome than is necessary to serve that interest. Defendant's Mem. of Law for Disposition on a Stip. R. at 7 ("Def.'s Mem.").

The First Amendment, made applicable to the States by the Fourteenth Amendment, prohibits the States from, among other things, abridging the freedom of speech. *Janus v. Am. Fed'n of State, Cnty, and Mum. Emp.*, 138 S. Ct. 2448, 2463 (2018). Persons subjected to a deprivation of their speech rights may, pursuant to 42 U.S.C. § 1983, bring an action

5

in federal court to obtain declaratory or injunctive relief against the official charged with the enforcement of a state law that abridges the freedom of speech.

So called "commercial speech," varyingly defined in Supreme Court precedent but understood to encompass speech uttered to market goods and services, is protected under the First Amendment. *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 762 (1976). More precisely, providers of good and services and consumers are entitled to engage in commercial speech activity without unduly burdensome interference by the government. *Id.* at 756, 762-64.

> Advertising, however tasteless and excessive it sometimes may seem, is nonetheless dissemination of information as to who is producing and selling what product, for what reason, and at what price. So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable.

*Id.* at 765. As set out in *Virginia Board of Pharmacy*, Plaintiff's interest in marketing its services to prospective clients is, beyond debate, deserving of protection under the First Amendment. Moreover, the stipulated facts demonstrate that Plaintiff's speech is in fact burdened by Maine's 36-Hour Rule. Plaintiff thus has standing to press the claim. *See Van Wagner Boston, LLC v. Davey*, 770 F.3d 33, 37 (1st Cir. 2014); *Ramirez v. Sanchez Ramos*, 438 F.3d 92, 98 (1st Cir. 2006).[3]

As an initial step in analyzing whether the 36-Hour Rule complies with the First

---

[3] I make the observation concerning standing only because Defendant appears to contest the issue, albeit obliquely. Def.'s Mem. at 7 & n.4.

Amendment, I must consider whether the Rule should be labeled "content-based" or "content-neutral." Plaintiff, hoping for application of strict scrutiny, advocates the former label. Pl.'s Mot. at 7-10. Defendant, seeking intermediate scrutiny, nominates the latter. Def.'s Mem. at 10-13.

Content-based regulations burden the messenger because his or her message is disfavored. *E.g.*, *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (invalidating state law that compelled licensed pregnancy-related clinicians to convey a message preferred by the state); *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (invalidating municipal code that categorized signs based on the type of information conveyed, affording greater of lesser permission on that basis). Content-based regulations are presumptively violative of expressive rights and will stand only where the regulation is narrowly tailored to serve a compelling state interest. *Becerra*, 138 S. Ct. at 2371; *Reed*, 135 S. Ct. at 2231. By comparison, content-neutral regulations burden the messenger to advance an interest other than message bias. *Rideout v. Gardner*, 838 F.3d 65, 71-72 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 1435 (2017) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). "Content-neutral restrictions are subject to intermediate scrutiny, which demands that the law be 'narrowly tailored to serve a significant governmental interest.'" *Id.* (quoting *Rock Against Racism*, 491 U.S. at 791). The distinction between a regulation narrowly tailored to a compelling interest, and one narrowly tailored to a significant interest, is that the latter is not required to be "the least restrictive or least intrusive means" of serving the ends in question. *Id.* (quoting *Rock Against Racism*, 491 U.S. at 798).

7

Plaintiff argues the 36-Hour Rule is content-based because it disfavors the expressive activity of public adjusters as compared to the expressive activity of insurance company adjusters, who do not have to wait 36 hours before engaging in loss adjustment activity. Pl.'s Mot. at 7-8. I am not entirely persuaded that the 36-Hour Rule imposes any message bias as between public adjusters and insurance company adjusters. As Defendant observes, Def.'s Mem. at 8, public adjusters and insurance company adjusters stand in different positions because the insurance company adjusters work at the invitation of the property owner. Should an insurance company adjuster arrive and communicate with the property owner within 36 hours of a covered loss, he or she will do so in fulfillment of a contractual obligation to do so, not opportunistically to solicit a contract for adjustment services. On the other hand, it is at least conceivable that the insurance company adjuster could take steps that compromise, or possibly even settle, a claim for coverage within the 36-hour window, while the property owner is presumed to be experiencing a great deal of emotional disturbance. Consequently, it is at least conceivable[4] that the 36-Hour Rule might not be even-handed in some instances because, oddly enough, it sweeps too narrowly by not constraining insurance company adjuster speech.

Although I am not convinced on the basis of the stipulated record that the 36-Hour Rule was designed to favor one speaker over another, as was the case in *Virginia Board of Pharmacy* (invalidating restrictions on pharmacy price advertisement), *Reed* (invalidating

---

[4] The parties have stipulated that insurance adjusters have been known to take steps within the 36-hour window that compromise the ability of others to fully evaluate the extent of a loss.

message-based sign regulation), and *Sorrell v. IMS Health*, 564 U.S. 552 (2011) (invalidating content- and speaker-based burdens that restricted only commercial behavior involving the exchange of information), it nevertheless strikes me as an inescapable conclusion that the Rule is the product of a paternalistic distaste for commercial speech[5] that transpires when one party to a communication is presumptively in a state of emotional upset. Given this basic underlying reality, asking whether the Rule is designed to regulate content or is a neutral regulation directed at commerce or conduct[6] is, frankly, like asking whether a new penny is stamped with Lincoln's head or the Union shield. There is room for both stamps, it so happens.[7]

As late as the middle part of the last century the Supreme Court likely would not have questioned the authority of the States to shield consumers from the perceived harms of a well-timed marketing pitch, *cf. Breard v. Alexandria*, 341 U.S. 622, 641-42 (1951) (sustaining conviction for violation of anti-solicitation ordinance that prohibited solicitors, peddlers, hawkers, itinerant merchants, and transient vendors from going to private residences uninvited); *Valentine v. Chrestensen*, 316 U.S. 52, 55 (1942) (sustaining prohibition on the distribution of handbills containing "commercial advertising matter"), but over the last 70 years there has been such a decided pendulum shift that one cannot

---

[5] One of the greatest curiosities of the jurisprudence concerning commercial speech is that "commercial speech" is itself a pejorative term that conveys a measure of bias.

[6] "It is also true that the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).

[7] In *Reed*, the Supreme Court observed that "a content-based law that restricted the political speech of all corporations would not become content neutral just because it singled out corporations as a class of speakers." 135 S. Ct. at 2230 (citing *Citizens United v. FEC*, 558 U.S. 310, 340-41 (2010)).

9

help but surmise that a majority of the justices on the Supreme Court are of the view that the Free Speech Clause was as much inspired by de Gournay as by Milton, Locke, or Mill. Given this pendulum shift, I fail to see how Defendant can expect me to articulate why the 36-Hour Rule is anything other than a vestige of an earlier era's bias against commercial speech in general. However, the other stamp fits too, and the Supreme Court has held that a state's interest in preventing a harm can be exercised in a manner that prevents a particular message from being received in the first place. *Fla. Bar v. Went For It*, *Inc.*, 515 U.S. 618, 631 (1995) (applying intermediate scrutiny after observing that "the harm posited by the Bar is as much a function of simple receipt of targeted solicitations within days of accidents as it is a function of the letters' contents"). Consequently, I will apply the intermediate scrutiny test set forth in *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York*, 100 S. Ct. 2343 (2005).

> The *Central Hudson* test has four parts:
>
> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

447 U.S. at 566. The parties agree that the speech of public adjusters is lawful and not misleading. The remaining issues are whether the government interest is substantial, and, if so, whether the regulation advances the interest without overburdening legitimate expression.

I find the interest to be "substantial." Defendant explains that the interests advanced

10

by the 36-Hour Rule are professional regulation and consumer protection. Def.'s Mem. at 8-9, 16. "Most notably," says Defendant, the Rule protects the privacy of "vulnerable" property owners by sparing them the indignity of "cold-call solicitations." *Id.* at 8-9, 14. While many philosophers would say that intellect is without purpose in the absence of passion, there are those who would also allow that strong passions are the enemy of reason. Most people can imagine, if they have not experienced, how an extreme misfortune can temporarily undermine the ability to make sound decisions. Additionally, the Supreme Court has held, specifically, that "targeted solicitations within days of accidents" are a "harm" that the State of Florida could redress in the context of attorney regulation.[8] *Went For It, Inc.*, 515 U.S. at 631. As resilient as the people of Maine may be, I cannot say they are any less susceptible to "targeted solicitations within days of accidents" than the people of Florida. Moreover, I think that common sense supports the finding that the average person would prefer the solicitation mail at issue in *Went for It*, to the cold-call knock at the door that is at issue in this case.

Defendant also argues the 36-Hour Rule is particularly weighty because it seeks to maintain professional standards. A speech-related regulation of "professional conduct" will be tolerated if it imposes only an "incidental" burden on speech activity. *Becerra*, 138

---

[8] Plaintiff says Defendant's showing on the interest issue is inadequate. Although the opinion expressed in *Breard* as to the constitutionality of absolute prohibition on cold-call solicitations has been discredited, the *Breard* Court took it as a given that the public, as a general rule, harbors an aversion to cold-call solicitation. 341 U.S. at 626-27 & n.3. *See also Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 627-28 (1995) (observing that the Bar mustered an "anecdotal record . . . noteworthy for its breadth and detail," but also stating, "we do not read our case law to require that empirical data come to us accompanied by a surfeit of background information. . . . [and] are satisfied that the ban on direct-mail solicitation in the immediate aftermath of accidents . . . targets a concrete, nonspeculative harm"). Plaintiff has not persuaded me that it would be improper for me to similarly credit Defendant's assertions about the desire of many property owners that the immediate aftermath of a fire loss not include cold-call solicitations.

S. Ct. at 2373. For example, in *Ohralik v. Ohio State Bar Association*, 436 U.S. 447 (1978), the Supreme Court upheld the imposition of professional sanctions against a lawyer who engaged in personal solicitation of accident victims at the hospital and in their homes. The Court specifically held "that the State – or the Bar acting with state authorization – constitutionally may discipline a lawyer for soliciting clients in person, for pecuniary gain, under circumstances likely to pose dangers that the State has a right to prevent." *Id.* at 449. Although the rationale for the holding rested heavily on "the profession's ideal of the attorney-client relationship," *id.* at 454, the solicitation restriction in *Ohralik* was also absolute, *id.* at 453 n.9, and was not limited as to time or place, as it is here. Moreover, the underlying interest, said to be the prohibition of barratry, champerty, and maintenance, *id.* at 454 n.11, is not entirely absent from the public adjuster's business formula.[9] For these reasons, in my estimation, the State's interest in professional regulation is not insubstantial in this case.

Finally, I must consider whether the 36-Hour Rule advances the interest in question, and whether it is permeable enough to stand against the first amendment gale whipped up by Plaintiff. On the first of these issues, I conclude that the Rule advances a privacy interest, although some of the argument advanced by Defendant is not helpful on that point (see below). In addition, the Rule advances the interest in professional regulation and consumer protection; specifically, the creation of a buffer period in which property owners

---

[9] "The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically be 'officers of the courts.'" *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975).

12

cannot compromise their rights through a contingent-fee contract. Therefore, I reach the issue of permeability.

Defendant argues the 36-Hour Rule is exceptionally permeable to speech activity. Specifically, Defendant states:

> The 36-Hour Rule limits only the soliciting or offering of an "adjustment services contract . . . to an insured for a fee" during the 36-hour period. The statute does not prohibit a public adjuster from communicating with victims (e.g., via direct discussion or dissemination of generic best-practices information; responding to consumer-initiated contacts; engaging in promotional advertising or untargeted mailers to the public; etc.)—so long as the adjuster does not solicit or offer a fee-for-service contract during that time. Further, the public adjuster would be unimpeded in asking the victim if it would be okay for the adjuster to take pictures of the scene, or to recommend that the victim preserve certain things (i.e., not to immediately agree with the company adjuster to cleaning or tear-down services).

Def.'s Mem. at 9-10.[10] In reply, Plaintiff argues that the actual language of the 36-Hour Rule is not that permissive. Pl.'s Mot. at 9. Plaintiff has a point. The Rule states that public adjusters "may not solicit or offer an adjustment services contract." 24-A M.R.S. § 1476(1). The Legislature's use of the disjunctive "or" reflects its understanding that solicitation is not the same thing as making an offer. Black's Law Dictionary tells us that the term "solicitation" includes "[a]n attempt or effort to gain business," and provides as an example attorney advertisements. Black's Law Dictionary (10th ed. 2014).

It is an age-old maxim that a statute must be construed according to its ordinary meaning, "for were a different rule to be admitted, no [person], however cautious and

---

[10] Defendant's argument that the Rule allows for so much communication is incompatible with Defendant's argument that the rule promotes a privacy interest. However, I do not credit Defendant's suggestions as to the amount of speech activity permitted by the Rule.

intelligent, could safely estimate the extent of his [or her] engagements, or rest upon his own understanding of a law, until a judicial construction … had been obtained." *Green v. Biddle*, 21 U.S. (8 Wheat.) 1, 89–90 (1821). Consistent with this maxim, a Maine court construing the 36-Hour Rule would treat the question as one of law, would give the words "their plain and ordinary meaning," and would seek to avoid treating words and phrases as mere "surplusage." *Passamaquoddy Water Dist. v. City of Eastport*, 1998 ME 94, ¶ 5, 710 A.2d 897, 899. Based on my reading of the 36-Hour Rule, the ban on "solicitation" is exceedingly broad and acts as a powerful deterrent to even educational outreach activity within the 36-hour window. In my view, it is extremely unlikely that the average property owner through an exercise of common sense would regard educational outreach activity as anything other than solicitation. If offense was taken by a property owner, and if Defendant received a complaint, it seems to me that Defendant would be equally hard-pressed to draw clear lines between educational speech and solicitation speech, especially where the speaker is only present on the scene to serve a commercial interest. In any case, Plaintiff's speech rights should not rest precariously on how Defendant chooses to characterize certain speech when the distinction between the two, in the world of three dimensions, appears to be tissue thin. I expect that Defendant likewise would prefer a less slippery footing upon which to ground his enforcement and disciplinary actions. The benefit of giving words in the statute their plain and ordinary meaning, is that the public charged with knowledge of and compliance with its prohibitions do not need to guess correctly as to the meaning that the official charged with its enforcement may give it. The people of Maine are governed by laws, not by the intention of legislators or the state officials charged with enforcement

of the laws. The text of the statute is the law, even if, as Defendant urges, it is not what was intended.[11] Were it otherwise, it would be like emperor Caligula posting edicts high up on the pillars, so that they could not easily be read.

In short, it stands to reason that Plaintiff does not believe it can communicate with property owners to share its knowledge or describe its services during the 36-hour period without getting scorched. Moreover, given Defendant's argument, it is apparent that Defendant perceives the need to make some allowances for the communication of information related to loss adjustment services. Defendant has also agreed to a stipulation that the burden is significant from an economic perspective. Still, it does not necessarily follow that Plaintiff's inability to strike while the iron is hot is offensive to the Free Speech Clause of the First Amendment.

While I accept that the 36-Hour Rule imposes an opportunity cost for Plaintiff – the parties have stipulated to that effect – I nevertheless conclude that, to the extent the 36-Hour Rule prohibits the actual offer of a public adjustment contract, the 36-hour delay is an "incidental" imposition that serves a substantial consumer protection interest. However, I also conclude that the ban on all solicitation activity, temporary as it may be, is an excessively paternalistic prior restraint on speech and, as such, sweeps more broadly than

---

[11] I do not find any support in the record that there is a difference between the language used in the statute and what the legislature intended. Even if there was such evidence, I would not credit it in the least. To the extent that there is any difference between what the legislature intended, assuming that such a thing is ever knowable, and the plain language of the law it passed, that is a problem for the political branch to address. The Court is not equipped with the metaphysical ability to divine the potpourri of the legislators' individual and collective intent as to what they thought the bill might be during debate, committee markup and final passage. Even if armed with such an ability, it would be distinctly undemocratic to rely on the Court, fingers crossed, as the Oracle of Delphi to reveal what was intended by the law even if it flies in the face of what the law says.

is necessary to serve the stated interests. Public adjusters are not attorneys subject to the heightened professional standard at work in *Ohralik*, and their services are lawful and not inherently misleading. Moreover, the privacy concern has been given little weight in other cases involving bans on direct solicitation activity. In my view, the interests in professional regulation and privacy do not support the temporary ban on solicitation speech. While it is understandable that many individuals would prefer not to receive solicitation of this kind shortly after suffering a loss, there are others who may welcome and benefit from the public adjuster's message. Those who are offended by such activity are, of course, free to express their view and turn away unwelcome callers. Our free speech rights demand a certain degree of personal fortitude.

Finally, in terms of the interest in consumer protection, prohibiting the offer of contract for 36 hours and allowing for rescission for another 48-hours is a fully adequate means of serving that interest.[12] It is not necessary to ban all solicitation as well. Permitting lawful solicitation that is not inherently misleading, while prohibiting conduct that involves closing a contract, in my view achieves the balance commanded by the Free Speech Clause or, more precisely, the intermediate-scrutiny, commercial-speech wax applied to the Free Speech Clause (and discussed in three concurring opinions) in *Central*

---

[12] Other courts have similarly overturned state laws restricting solicitation activity by public adjusters. *See Atwater v. Kortum*, 95 So.3d 85, 87 (Fla. 2012) (concluding that a 48-hour ban on solicitation and any "contact" was excessive); *Ins. Adjustment Bureau v. Ins. Comm'r for Commonwealth of Pa.*, 542 A.2d 1317, 1323-24 (1988) (concluding that requirements of a bond, a form contract, a four-day rescission period, and a prohibition on misrepresentation were protection enough and invalidating a 24-hour ban on solicitation as an excessive prior restraint on speech).

*Hudson*. I therefore grant Plaintiff partial relief, solely with respect to the prohibition against solicitation.[13]

## CONCLUSION

Plaintiff's request for judgment on the stipulated record is granted in part and denied in part. The Court hereby declares as unconstitutional, in violation of the Free Speech Clause, that portion of 24-A M.R.S. § 1476(1) that prohibits solicitation of public adjuster services.[14]

**SO ORDERED.**

Dated this 8th day of January, 2018.

/S/ Lance E. Walker
**LANCE E. WALKER**
**UNITED STATES DISTRICT JUDGE**

---

[13] In fashioning a remedy, the Court can wield a carving knife rather than an axe. "Severability is a matter of state law," *R.I. Med. Soc'y v. Whitehouse*, 239 F.3d 104, 106 (1st Cir. 2001), and "Maine law mandates that the 'provisions of the statutes are severable,'" *IMS Health Corp. v. Rowe*, 532 F. Supp. 2d 183, 186 (D. Me. 2008) (quoting 1 M.R.S.A. § 71(8)). "An invalid portion of a statute or an ordinance will result in the entire statute or ordinance being void only when it is such an integral portion of the entire statute or ordinance that the enacting body would have only enacted the legislation as a whole." *Kittery Retail Ventures, LLC v. Town of Kittery*, 2004 ME 65, ¶ 18, 856 A.2d 1183, 1190. Here, the two prohibitions in the 36-Hour Rule are severable for purposes of remedy.

[14] The stipulated facts do not describe circumstances suggesting the need for injunctive relief at this time.